STATE OF CONNECTICUT *v.* BULL INVESTMENT GROUP, INC., ET AL.

SUPERIOR COURT      HARTFORD COUNTY      FILE NO. 188791

Memorandum filed October 21, 1974

*Carl R. Ajello,* attorney general, and *Daniel R. Schaefer,* assistant attorney general, for the plaintiff.

*Daniel J. Hagearty,* for the defendants.

NARUK, J. The within action for injunctive and other relief was brought by the state of Connecticut, acting through its attorney general at the request of the commissioner of consumer protection. The complaint is in eight counts, alleging in essence that the various defendants, individually and collectively, have engaged in the following: (1) violations of Public Act 73-493, now General Statutes §§ 42-144 to 42-150; (2) misrepresentation of profits; (3) abuse of confidential relationship; (4) falsification of loan applications; (5) an illegal lottery; (6) illegal sale of securities; (7) transacting corporate business in violation of § 33-396 of the General Statutes; and (8) illegal corporate activities.

The defendants are Bull Investment Group, Inc., a New Hampshire corporation; Golden Book of Values, Inc., a New Jersey corporation; Ronald Kimball; James Sanford; Richard Grondin; Vincelo D. Mello; James V. Zito; Thomas P. D'Amico; and Dennis Fahey.[1] The individual defendants are officers, directors, employees, or agents of the defendant corporations. All of the defendants have entered a general appearance and are represented by the same counsel. The defendants deny the operative portions of the plaintiff's complaint. In addition thereto, they plead as special defenses, in summary, that the corporate defendants are individual entities who have contracted with each other for the purpose of creating a multilevel marketing plan which does not violate §§ 42-144 to 42-150 of the General Statutes, and that most of the contracts entered into by them in Connecticut were in effect prior to October 1, 1973, the effective date of those statutes.

---

[1] Ron Masure, a New Jersey resident, and Robert Koulangis, a Massachusetts resident, were named as defendants in the complaint, but the case was withdrawn as to them by agreement of counsel at the beginning of trial.

An ex parte restraining order was granted by the court at the plaintiff's application. By agreement of the parties, a single hearing on the merits was held as to the issuance of both a temporary and a permanent injunction and such other relief as the plaintiff claimed.

The defendant corporations admittedly had been engaged in the sale of so-called Golden Book dealerships to members of the general public for the sum of $2500. For that sum, the purchaser becomes one of a number of similar dealers in a designated geographical area with a right to sell advertisements to merchants in a booklet called the "Golden Book of Values." Of the $195 paid for such advertisement by the merchant, the dealer receives a $97.50 commission. The dealer also obtains the right to sell "Golden Book Value Cards" to the general public at a price of $15 each. On each card sold, the dealer receives a commission of $12. Further, he has the right to authorize the sale of such cards by the advertising merchant or other subagents. The dealer's commission on the subagent sales amounts to $8 per card and that of the person actually making the sale is $4. Identical commissions are to be paid on annual renewals of advertisements or cards. The state of Connecticut has been assigned a total quota of 270 dealers by the defendants.

Each of the merchants' advertisements offers a product or a service at a discount from the normal price. If the card purchaser avails himself of all such discounts, he purportedly saves himself a sum that could total up to $1500. Such savings are the inducement for the purchase of the cards by the members of the general public.

The defendant Bull Investment Group, Inc., through its agents, has conducted so-called "opportunity meetings" in Connecticut for the recruitment

of the aforesaid dealers for the defendant Golden Book of Values, Inc. In so doing, it purports to act only as a recruiting agency for the defendant Golden Book of Values, Inc., with no interest in the sale of advertisements to merchants or cards to the public. For its services, Bull Investment Group, Inc., receives $900 of the $2500 paid by the dealer-purchaser. Another $900 is paid to the salesman enrolling the purchaser, leaving $700 after deduction of the aforesaid commissions for Golden Book of Values, Inc. The legal relationship between the two corporations is allegedly based upon a written contract which could not be located by the defendants. The activities of Golden Book of Values, Inc., purport to be limited to the sale of advertising to merchants and value cards to consumers.

At the time of his enrolment, the dealer-purchaser executes two contracts. One, for which he pays the aforementioned $2500, is with Golden Book of Values, Inc. The other, for which no consideration is allegedly paid, is with Bull Investment Group, Inc. Interestingly enough, it is the latter with its possibility of $900 commissions for each new dealer-purchaser that would appear to be the more lucrative contract for the dealer.

The methods employed by the salesmen who enrol new dealers, known as ISAs are exactly prescribed by an "ISA Operating Manual" furnished by the defendant Bull Investment Group, Inc. In it salesmen are told never to explain the program to prospects before bringing them to an opportunity meeting. Rather, they are to arouse the prospect's curiosity by references to an extraordinary financial opportunity. The principal selling effort occurs at those opportunity meetings over which the salesman has no control. The script for those meetings is taken verbatim from the manual prepared by the

defendant Bull Investment Group, Inc., and is always the same. It is always greeted, however, by enthusiastic cheers and applause as the speaker outlines, in rapid-fire fashion, how anyone can make over $50,000 per year. At that point, no clear distinction is drawn between the activities of a dealer as an ISA or as a Golden Book dealer. The alleged earnings opportunities of each are commingled and presented as one package. The total impression that is deliberately created is that a person with little or no business experience or training, and no other special talents, may easily earn large sums of money by part-time work. Further, the hard sell techniques employed to obtain a purchaser's signature to the contracts involved are designed to avoid rational analysis and have their roots in actual misrepresentation. For example, the purchaser's signature is obtained by asking him to witness the salesman's signature. No purchasers have achieved anything even remotely resembling the financial success implicitly promised by the defendants and their agents.

## I

By its enactment of § 42-145 of the General Statutes, the Connecticut legislature has prohibited the sale of rights or privileges with a payment or other consideration to the purchaser which is contingent upon the procurement of prospective customers by the purchaser. It thereby prohibited such merchandising schemes as "referral sales" or "horizontal pyramiding." The evidence in the present case shows that the defendant corporations and their agents are involved in a "horizontal pyramiding" operation. The dealer-ISA distinction claimed by the defendants is clearly controverted by one of the stipulations entered into by the parties during the trial. That stipulation shows that all Connecticut dealers signed ISA agreements; that virtually

all ISA agreements were signed on the same day as the Golden Book dealership agreements; and that, with the exception of one ISA who began enrolling dealers in 1972, all ISAs who enrolled additional dealers in Connecticut were also dealers themselves. Further, the manual used and the format of the opportunity meetings presuppose that ISAs are dealers and that dealers are ISAs. The clear import of these facts is that the recruiting of additional dealers by other dealers is the principal method of earning money for those who contract with the defendant corporations. The $900 commission for recruiting additional dealers far surpasses the $97.50 from the sale of a Golden Book advertisement or the $12 commission from the sale of a value card. Further, neither the Golden Book advertisements or value cards may be sold until the designated quota of dealers is recruited for the particular geographical territory. In Connecticut, the only area "closed," i.e., with a completed quota of dealers, was the New Britain area. From the last week of December, 1973, until May 21, 1974, only thirty-six advertisements had been sold in that area, although one hundred and fifteen were necessary for the publication of a Golden Book. In the meantime, five other areas were opened for the sale of dealerships, Waterbury, Middlesex, Hartford, Danbury, and Windsor. Thus, in approximately two years, the corporate defendants and their agents have opened one area after another in Connecticut for the purpose of recruiting dealers but never have published a Golden Book or sold a value card. Further, none of the Golden Books from other states that had been introduced into evidence, with one exception, had ever been reissued after the expiration of one year. Finally, the geometric progression inherent in the defendants' marketing scheme means that the available market will be saturated before most of the dealer-purchasers can earn any profit

at all. As pointed out by the expert produced by the plaintiff, each ISA-dealer would have to recruit three new dealers at a $900 commission for each to recoup his original investment of $2500. Assuming that each of the three new dealers was successful in recruiting three additional dealers until the Connecticut quota of 270 dealers was attained, only twenty-seven individuals would make a profit. The other 243 purchaser-dealers would sustain losses the magnitude of which would depend upon how far down the pyramid level they were when recruited. Since the number of dealers at each level increases by a factor of three, i.e., 3, 9, 27, 81, 243, 729, etc., the entire population of Connecticut would be exhausted in thirteen months if each dealer recruited three additional dealers per month. The limitation of the number of dealers to 270 only means that the available market will be saturated that much sooner, i.e., within six months after the first dealer is recruited. Under similar circumstances, the Iowa Supreme Court interpreted a statute comparable to § 42-145 of the General Statutes as prohibiting a pyramid merchandising scheme. *State ex rel. Turner* v. *Koscot Interplanetary, Inc.,* 191 N.W.2d 624 (Iowa). Similar results have been reached in other states under different statutes. See *People* v. *Koscot Interplanetary, Inc.,* 37 Mich. App. 447; *State ex rel. Morgan* v. *Dare To Be Great, Inc.,* 15 N.C. App. 275; *Kugler* v. *Koscot Interplanetary, Inc.,* 120 N.J. Super. 216; and *Commonwealth* v. *Koscot Interplanetary, Inc.,* 54 Erie 79 (Pa.). See also note, "Pyramid Schemes: Dare to Be Regulated," 61 Geo. L.J. 1257, 1262–1266.

The attempt of the defendants to differentiate between vertical and horizontal pyramiding is without merit. Both forms of pyramiding involve "a rebate or payment . . . to the purchaser which is contingent upon procurement of prospective cus-

tomers procured by the purchaser" and are declared unlawful by the language of § 42-145. Consequently, the court must conclude that the merchandising program participated in by all of the defendants was in violation of § 42-145.

## II

It is clear from the evidence and stipulations that the dealers recruited by the defendants have made their initial investment on the basis of the financial representations made at the opportunity meetings conducted by the defendants and their agents. One need only to look at the earnings of the ISA-dealers recruited in Connecticut and the defense witnesses who had been ISA-dealers elsewhere to conclude that those financial representations were false and were made knowingly or recklessly, without any factual basis to justify them.

Back in 1898, our Supreme Court in the case of *Scholfield Gear & Pulley Co.* v. *Scholfield,* 71 Conn. 1, 19, stated the following with regard to common-law fraud: "Deception accomplished by false statements is not excused by a groundless belief in their truth on the part of the man who makes them; and amounts to legal fraud, if they are uttered to induce action on the part of another, from which loss naturally results. In matters susceptible of actual knowledge, if the party who has and is known to have the best means of knowledge, makes an affirmation contrary to the truth, in order to secure some benefit to himself, the law treats him as stating that he knows that whereof he affirms, and so as guilty of a fraud, although he spoke in ignorance of the facts; because he asserts that he knows what he does not know." On the facts of the instant case, both the corporate defendants and the individual defendants are guilty of fraud as defined in the *Scholfield* case. Fraud was practiced on all dealer-purchasers,

including those who had signed contracts with the corporate defendants prior to the enactment of §§ 42-144 to 42-150 of the General Statutes. The professed superior business knowledge of the defendants, the faked spontaneity and rapid-fire delivery of the speakers at the opportunity meetings, and the high-pressure tactics to get contracts signed were all designed to prevent rational inquiry and to appeal to the dealer-purchasers' desire for easy money. Further, pyramid sales have been held, by their very nature, to be inherently fraudulent. See *Blachly* v. *United States,* 380 F.2d 665; *Kugler* v. *Koscot Interplanetary, Inc.,* 120 N.J. Super. 216; and *Matter of State of New York* v. *ITM, Inc.,* 52 Misc. 2d 39 (N.Y.).

Clearly, the plaintiff has proved the allegations of the second count.

### III

In the third count, the plaintiff claims an abuse of a confidential relationship which existed between the defendants and dealers-purchasers. To prevail on that point, it is necessary for the plaintiff to show that a relationship of special trust and confidence existed between the parties. *Worobey* v. *Sibieth,* 136 Conn. 352. In the instant case, there was no evidence of any such relationship as that of parent and child, fiduciary and beneficiary, attorney and client, or other relationship from which the law would imply a higher duty of fair dealing than it would in a business transaction. The only relationship between the parties involved was that of a business nature, and therefore, the court finds the issues on that count for the defendants.

### IV

The allegations of the fourth count of the complaint that the defendants advised prospective dealer-purchasers to falsify loan applications as a

means of obtaining the necessary funds with which to finance their purchase finds ample support in the evidence. "Banking" was an integral part of the so-called alpha schools conducted by the defendants wherein ISAs were taught to advise their prospects to request personal rather than business loans from lending institutions. Prospects were advised to give as reasons for such loans contemplated advantageous purchases of furniture and stereos from persons leaving the area rather than the true purpose. Further, the same story would be repeated to a number of lending institutions until the necessary $2500 was obtained. The corporate defendants' agents assisted in obtaining those loans and were present when the loan applications were falsely completed.

## V

In the fifth count, the plaintiff contends that the defendants' merchandising scheme constitutes a lottery in violation of Public Act 73-455, now General Statutes §§ 53-278a to 53-278g. Section 53-278a prohibits "conducting lotteries" as part of the definition of "professional gambling."

The validity of plaintiff's contention finds support in the work of legal scholars and the court decisions of sister states. In note "Pyramid Schemes: Dare to Be Regulated," 61 Geo. L.J. 1257, 1269, the authors point out the following: "Pyramid schemes possess the three essential elements of a lottery. The substantial sums participants invest in the schemes constitute the necessary consideration and the receipt by the participants of profits resulting from the recruiting of others satisfies the prize element. The element of chance is present because the financial gain of any participant is the result of factors outside his control: the action of prior participants, the degree of market saturation, and

the prospects of an individual continuing the recruiting chain." The following court decisions have also deemed pyramid schemes to be in violation of state lottery laws. *Commonwealth* v. *Allen,* 404 S.W.2d 464 (Ky.); *People* v. *Koscot Interplanetary, Inc.,* 37 Mich. App. 447; *Matter of State of New York* v. *ITM, Inc.,* 52 Misc. 2d 39 (N.Y.); and *Sherwood & Roberts-Yakima, Inc.* v. *Leach,* 67 Wash. 2d 630.

Based on the evidence presented and the legal precedents cited, the court finds the defendants' merchandising scheme constitutes a lottery in violation of § 53-278b of the General Statutes.

## VI

The defendants have stipulated that they have failed to register with or to be licensed by the bank commissioner of the state of Connecticut as brokers, dealers, salesmen, investment counsel, or investment counsel agents, as provided for in §§ 36-321 and 36-322 of The Connecticut Securities Act. In addition, the plaintiff claims the defendants are in violation of § 36-338 of that act. Section 36-338 (a) of The Connecticut Securities Act provides as follows: "No person, in connection with the sale . . . of any security, directly or indirectly, shall (1) employ any device, scheme or artifice to defraud, (2) make any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, or (3) engage in any act, practice or course of business which operates or would operate as a fraud or deceit upon any person."

There is no question, as previously recited, that the defendants (1) were involved in a fraudulent pyramid merchandising scheme and (2) made untrue statements concerning prospective earnings. The

question, under the sixth count of the complaint, is whether such fraudulent pyramid scheme and untrue earning statements were connected with the sale of a "security."

Section 36-321 (b) defines a security as, among other things, an "investment contract." In *Securities & Exchange Commission* v. *Howey Co.*, 328 U.S. 293, 298–99, the United States Supreme Court, in interpreting a similar statute, defined an "investment contract" as "a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party." In two recent cases, under facts similar to those of the instant case, the United States Court of Appeals for the Fifth Circuit and that for the Ninth Circuit have held comparable pyramid fraud schemes to be investment contracts. See *Securities & Exchange Commission* v. *Koscot Interplanetary, Inc.*, 497 F.2d 473 (5th Cir.), and *Securities & Exchange Commission* v. *Glenn W. Turner Enterprises, Inc.*, 474 F.2d 476 (9th Cir.), cert. denied, 414 U.S. 821. In each of those cases, as in the present case, the success of the enterprise was controlled by the efforts of the promoters and the role of the investor was limited to bringing in new sheep to be sheared by the high-pressure tactics of the defendants' agents. As was pointed out in the District Court opinion in *Securities & Exchange Commission* v. *Glenn W. Turner Enterprises, Inc.*, 348 F. Sup. 766, 775, the "defendants' revival-type sales methods . . . [were] the common thread upon which everybody's beads were strung."

This court therefore finds that the defendants were involved in the sale of a security in violation of § 36-338 (a) of the General Statutes and that the defendant corporations and the defendants Kimball, Sanford, and Grondin were not registered as

"brokers" or "dealers" under the provisions of § 36-322 of the act. The court further finds that the defendants Mello, Zito, D'Amico, and Fahey had failed to register as "salesmen" under § 36-322.

## VII

Although at the time the pleadings were closed neither of the defendant corporations had registered as a foreign corporation doing business in the state of Connecticut pursuant to § 33-396 of the General Statutes, registrations were completed during the course of the trial and copies of the appropriate certificates of authority were filed with the court. That belated registration, however, did not remove the corporate defendants' liability for the fees, taxes, and $500 penalty provided for in § 33-412 (c) of the General Statutes. Since the plaintiff did not introduce any evidence as to the amount of the fees and taxes due to the state of Connecticut, the court cannot make any award as to those items. Each of the corporate defendants, however, is hereby ordered to pay the statutory penalty of $500 as provided for in § 33-412 (c) to the state of Connecticut.

## VIII

The eighth count of the plaintiff's complaint is based upon § 33-301 of the General Statutes which gives the attorney general the power to institute an injunctive action "to restrain any person from purporting to have or exercising corporate powers not granted." That authority is based upon the premise that corporations are not granted charters to perpetrate fraud or other illegal acts contrary to established public policy. See *State ex rel. Voyles* v. *French Lick Springs Hotel Co.*, 42 Ind. App. 282 (1908). Such authority also existed at common law. See 10 Fletcher, Private Corporations (Perm. Ed.) §§ 4854, 4855, 4869; 4 Pomeroy, Equity Jurispru-

dence (5th Ed.) § 1093 p. 272, § 1349. Section 42-150 of the General Statutes expressly states that nothing in the act shall serve as a limitation on the previously mentioned statutory and common-law powers of the attorney general to seek injunctive relief. Consequently, the general power of the attorney general to seek to enjoin ultra vires corporate activity may be employed to enjoin violations of §§ 42-144 to 42-150. In light of the court's finding on the first count, the eighth count adds nothing to the liability of the defendants and is a surplusage.

## IX

The plaintiff seeks relief from all of the defendants and thereby seeks to hold the individual defendants equally liable with the corporate defendants for their actions. Although normally a corporation is a separate legal entity and serves to protect the persons acting in its behalf from personal liability, the law of equity, to do justice, makes an exception where the corporate form is used by individuals for the perpetuation of a fraud. *Zaist* v. *Olson*, 154 Conn. 563; *Kugler* v. *Koscot Interplanetary, Inc.*, 120 N.J. Super. 216.

From his own testimony, it was obvious that the defendant Kimball not only organized both corporations but formulated their policies and programs after those he had learned from Glenn Turner as a Koscot distributor. He wrote the training manual originally used by Golden Book of Values, Inc., and later by Bull Investment Group, Inc., which was patterned after the Koscot manual. He has attended and spoken at opportunity meetings. He was chairman of the board of Golden Book of Values, Inc., until he sold his stock to the defendant Sanford when he organized Bull Investment Group, Inc., of which he is still president and sole stockholder. Golden Book of Values, Inc., became the first and principal client of Bull Investment Group,

Inc. As a matter of fact, until the intervention of the Connecticut department of consumer protection, the ISA manual used by Bull Investment Group, Inc., referred to Golden Book of Values, Inc., as a subsidiary of Bull Investment Group, Inc. The defendant Sanford, who met Kimball while both were agents for Koscot, has been involved with Kimball since the latter organized Golden Book of Values, Inc. He has been a stockholder and director of that corporation from the beginning. Both Kimball and Sanford were portrayed in the slide presentation used at opportunity meetings and in the ISA training manual as huge financial successes to be emulated by the ISA-dealers. The joint success of Bull Investment Group, Inc., and Golden Book of Values, Inc., was attributed to their personal efforts, guidance, and direction. Both of the individual defendants wrote introductory messages to the training manual. The one written by Kimball describes him as "Chairman of the Board," without any corporate name. The one written by Sanford describes him as "Chairman of the Executive Committee, B.I.G., Inc." All checks received by the Connecticut state director for Bull Investment Group, Inc., and contracts signed with both Bull Investment Group, Inc., and Golden Book of Values, Inc., were sent to New Jersey to Louis Sanford, the father of the defendant James Sanford, without any regard to corporate designation. Louis Sanford signed all Connecticut Golden Book of Values, Inc., dealer contracts and all but a portion of the New Britain ISA contracts. His official title was administrative director for Bull Investment Group, Inc. Finally, both corporations are located in the same office in Cherry Hill, New Jersey. The identity of both individual defendants and the two corporate defendants are so merged in the operations conducted by them as to be inseparable. Clearly, the defendant corporations were the alter egos of the

two individual defendants referred to and were deliberately utilized by them as a means of personally profiting from an illegal pyramid fraud.

The only reasonable conclusion that can be drawn from the above facts is that the defendant Kimball, who admitted having studied the legal decisions involving such pyramid schemes as Koscot, Best-Line, and Holiday Magic, attempted to avoid the legal pitfalls in which the latter had become ensnared by separating the Golden Book operation into two distinct legal entities. That conclusion is buttressed by the fact that the defendant Sanford never testified at the trial, although he was physically present in the courtroom and obviously would have been in a unique position to show that Golden Book of Values, Inc., was a separate and distinct legal entity from Bull Investment Group, Inc., and the two principal individual defendants.

In light of the above facts, the defendants Kimball and Sanford are held jointly and severally liable with the defendant corporations for the illegal activities of the latter. Since there was no similar showing of domination, control, and commingling as to the other individuals who are named defendants, the same principles do not apply to them and they are not held to be jointly liable with the defendant corporations for the illegal corporate acts.

## X

In light of the above findings and conclusions, judgment may enter permanently enjoining all of the defendants, their agents, employees, successors, and assigns from engaging in, carrying on, or doing any and all of the following activities, either directly or indirectly: (1) from selling, offering to sell, Golden Book dealerships or ISA contracts to residents or citizens of Connecticut which, individually or collectively, authorize the owners to sell dealer-

ships in any form to others; (2) from authorizing others to make such sales; (3) from convening or conducting, or authorizing others to convene or conduct, opportunity meetings, training schools, or other similar functions or gatherings in Connecticut, or transporting, inviting or soliciting residents or citizens of Connecticut to attend or participate in such meetings, functions, or gatherings outside this state; (4) instituting any other multilevel marketing or merchandising plan in the state of Connecticut without express court approval; (5) authorizing, permitting, aiding or abetting any other person or entity in doing any of the acts enjoined herein.

Since § 42-148 empowers the court to order restitution to the parties defrauded by the defendants, the judgment will also direct the defendants Bull Investment Group, Inc., Golden Book of Values, Inc., Ronald Kimball, and James Sanford to jointly and severally refund to all Connecticut Golden Book dealers, who desire it, moneys paid by them to Bull Investment Group, Inc., and Golden Book of Values, Inc., for their dealerships, less commissions received by those dealers as the result of their sales of any dealerships as ISAs. The court will hold a supplemental hearing for determining the appropriate notice to be given to dealers entitled to refunds and the method and time for filing claims for refund, within two weeks from the filing of this memorandum of decision.

The judgment, as previously noted, will also assess against each of the corporate defendants the $500 statutory penalty provided for in § 33-412 (c) of the General Statutes and direct their payment thereof.

Finally, the corporate defendants and the defendants Kimball and Sanford shall pay all court costs to the plaintiff.