BARNETT, J.
 

 The present case is an action brought under the Connecticut Unfair Trade Practices Act
 
 *572
 
 (CUTPA), General Statutes §§ 42-110a through 42-110q, and the contingent transactions statutes, General Statutes §§ 42-144 through 42-150. The court must now decide whether to grant the plaintiffs motion for certification as a class action. The case was removed to and has been returned from the United States District Court for the District of Connecticut. The motion for certification was made initially while the case was in the federal system. At the request of this court the motion was filed again after the case was returned.
 

 The requisites for a class action are set forth in Practice Book § 87. The class must be so numerous that joinder of all members is impracticable. There must be questions of law or fact commonto the class. The claims or defenses of the representative party must be typical of the claims or defenses of the class. And the representative party must be one who will fairly and adequately protect the interests of the class.
 

 In addition to the foregoing requirements, a movant for certification as a class action has to satisfy the provisions of Practice Book § 88. The questions of law or fact common to members of the class must predominate over any questions affecting only individual members and a class action has to be found to be superior to other available methods for the fair and efficient adjudication of the controversy.
 

 Practice Book §§87 and 88 are substantially similar to the language of rule 23 of the Federal Rules of Civil Procedure so that federal decisions provide aid in determining whether the requirements for a Connecticut class action have been proven.
 
 Arduini
 
 v.
 
 Automobile Ins. Co. of Hartford, Connecticut,
 
 23 Conn. App. 585, 589, 583 A.2d 152 (1990). The plaintiffs burden of establishing each requirement has been described as heavy although, if the elements are present, the decision
 
 *573
 
 of whether to certify is essentially a discretionary matter. Id., 589-90, citing
 
 Califano
 
 v.
 
 Yamasaki,
 
 442 U.S. 682, 703, 99 S. Ct. 2545, 61 L. Ed. 2d 176 (1979).
 

 I
 

 From the evidence that was produced at the hearing, including reasonable inferences deduced therefrom, the following facts relevant to the issue of certification are found to have been established.
 

 The plaintiff, Robert Walsh, is a lifelong resident of Connecticut. He has been and presently is again a truck driver. While out of work in March, 1991, he became interested in becoming a dealer for the defendant after reading a newspaper advertisement. The defendant, National Safety Associates, Inc. (National), is a corporation that manufacturers air and water treatment devices and markets them throughout the United States and in Canada and Europe. The method of marketing is through a multilevel sales force of independent distributors and dealers. National itself, does not sell its products directly to the general public.
 

 As a result of the newspaper advertisement, the plaintiff went to a specific address in Enfield. The location consisted of several rooms including a room where prospects were greeted, an auditorium for meetings, lectures and training sessions and, between the two, a room with desks, telephones and answering machines. There were many telephones. The plaintiff estimated thirty to forty.
 

 On March 12, 1991, at the Enfield suite, talks were given to the plaintiff and to about seventy to eighty other prospective dealers by David Scott, Chris Fluet and two other speakers. The presentations lasted for at least a couple of hours. All the speakers represented that success as a dealer would be easy to achieve. Scott
 
 *574
 
 said that 50 percent of prospective customers would become purchasers of National’s water filters.
 

 Another part of the presentation was the showing of a video entitled “Living The Dream II.” This video was produced by Dreams Unlimited, Inc., for National. At the beginning of the video, the following disclaimer appears: “The incomes represented on this tape are above [National] incomes. There is no guarantee that [a National] distributor will earn any income whatsoever. The income, if any, of each distributor is solely based upon the personal efforts and abilities of the individual participant in the [National] program.” The film then portrays a National convention in Las Vegas, Nevada, where people from various states describe their successes and give the amounts of their very sizeable earnings. Also mentioned in the film is the award given to National for being the top direct sales company by the city of Memphis, Tennessee, and National’s favorable rating by Dunn and Bradstreet. An auspicious future for National’s products is predicted. The “Stairsteps of Opportunity,” a sales hierarchy, is discussed. The video ends with further testimonials from highly successful National distributors.
 

 Another aspect of the presentation was the importance of the “downline.” The downline can be described as an extended sales group. In National’s set-up, a dealer or distributor earns a percentage of the purchases of National’s products that are made by persons he or she has recruited. These persons, in a table of organization, are below the recruiting dealer; hence the nomenclature downline. Conversely, the person who recruits the dealer receives a percentage of the value of the purchases made by the dealer and the dealer’s downline. Such a person is termed the dealer’s “upline.”
 

 The plaintiff signed up as a dealer and paid the $25 application fee on March 12, 1991, after listening to
 
 *575
 
 Scott, Fluet and the other speakers. When he signed his application, the plaintiff was aware that in distributing National’s products, Scott and Fluet were independent contractors but he was uncertain as to what that relationship meant. On the reverse side of the plaintiffs application appear printed statements that the dealer’s relationship to National is that of an independent contractor and that the dealer is not authorized to bind National or to incur any obligation on behalf of National. Similar statements concerning the dealer’s sponsor and direct distributor also appear on the reverse side. On the front side of the application, however, there is the following felicitous message: “Congratulations and welcome to National Safety Associates, Inc.! We are proud to have you as a member of our team and wish you the best for your future with our company. Our Home Office Staff stands ready to assist you in a variety of areas should you need it. Our number is (901) 366-9288.”
 

 The application form has the title “[National] Independent Dealer/Distributor application.” In addition to information about the applicant, the form also has spaces for the names, social security numbers and signatures of the plaintiffs sponsor and the direct distributor in whose downline the plaintiff would be. David Haze was the sponsor and Fluet was the direct distributor who, according to the application, had the responsibility of placing the plaintiffs orders and paying him his rebates.
 

 When the plaintiff became a dealer on March 12,1991, he was given a pamphlet entitled “[National] Profit and Incentive” in which purchase volume credits are described and National’s Stairsteps of Opportunity are explained. Basically, each step represents a different quantity level of items purchased from National. Six steps exist on the hypothetical stairs: dealer; direct distributor; car qualified direct distributor; sales coordinator; fifth dimension sales coordinator; and national
 
 *576
 
 marketing director. The more that a dealer and his downline purchase, the higher the dealer and his upline climb on the stairs. In the presentations that were made to the plaintiff and to other recruits, the Stairsteps of Opportunity, as heretofore noted, were included and “[National] Profit and Incentive” was handed out to all new dealers recruited through the Enfield office.
 

 About one week after the plaintiff had become a dealer, he received his dealer kit. The kit contained the general information manual in which appear a copy of the front side of the application form and a much more complete set of rules known as form #95312. Then, on the reverse side of the application form appears suggestions for ordering and selling merchandise, explanations of rebates and credits, descriptions of products and a section on customer service, warranty and product replacement. The type of information contained in the manual, which was not available on March 12, 1991, when the plaintiff became a dealer, makes his sponsor’s representation on the application that the sales program was explained in its entirety highly unlikely. The absence of a manual on March 12, 1991, also means that the plaintiffs statement on the application that he had read form #95312 (the rules) was probably incorrect.
 

 Other items in the dealer’s kit were a pamphlet entitled “The Key to Your Future,” a one page (front and back) document describing the opportunities given to a National dealer because of rebates and downline possibilities and, on the other side, a recitation of a selling situation in which a product is demonstrated for the customer before the actual sale, a small card outlining ten steps to the consummation of a sale and a videotape. The-items in the plaintiffs dealer kit were included in all dealers’ kits. A new dealer is expected to order a
 
 *577
 
 kit although, technically, he or she is not obligated to do so. “The Key to Your Future” is a pamphlet that is divided into seven segments dealing with “Our Product,” “Our Place,” “Our Prospects and Publication,” “Our Presentation,” “Our Program,” “Our People,” and “Our Potential.” The “Our Product” section emphasizes the superiority of National’s water and air cleaning devices over chlorinated drinking water and polluted air. “Our Place” is a description of National’s headquarters in Tennessee. In “Our Prospects and Publication,” National’s magazine for dealers, “Success Express,” is lauded, as is also a publication referred to as a “Memory Jogger and Prospect Guide” that helps a dealer to recall people who would make good direct sales prospects. The recommended sales approach is the subject of “Our Presentation.” National’s method is a two-call trial-use presentation. In the first house call, the product is demonstrated and left so the prospective customer can use it before the salesperson returns. In “Our Program” the rebate for purchases and the direct sale are described. To advance on the stairsteps and to secure extra bonuses, however, the dealer-direct distributor is advised to build his or her own sales organization — a downline. “Our People” introduces people connected with the defendant’s management. “Our Potential” advises that National’s products are needed because everyone drinks water and everyone breathes.
 

 The videotape was produced and copyrighted by National and shown to dealers and included in dealer’s kits in 1991. In the video, the representation is made that the income of a dealer-distributor could increase to several thousand dollars per month. Rex Allen of Walt Disney fame is the narrator of the film, and Jay Martin, National’s president, appears in it and suggests that forty sales per month is realistic especially if down-
 
 *578
 
 liners are involved. The plaintiff watched the videotape on the same day that he received it.
 

 The plaintiff attended one or two training sessions per day for about five or six days a week. The representations that were made before he became a dealer continued to be made. In 1991, three kinds of meetings were permitted in National’s program: national meetings sponsored and paid for by National; regional school meetings put on by regional leaders but underwritten by National; and local meetings where one or more distributors would sponsor and pay for sessions to present the company, the product, the marketing plan for selling the product and the opportunity to advance through the building of a sales organization. The lectures that the plaintiff attended on March 12,1991, and the sessions that he attended after he became a dealer were local meetings organized and held by Scott.
 

 Subsequently, the plaintiff and other new dealers were assigned to answer telephone calls at the Enfield office and to respond to calls that were recorded on an answering machine. The callers were persons who, like the plaintiff, had read the recruitment advertisements in the newspaper. The plaintiff and the other new dealers were given instructions as to how the calls should be answered and a script to use. One instruction that was given, and seemingly borne out by the script, was to avoid mentioning National’s name and instead to describe the company as a national marketing concern that was growing in the area. The script has questions about the caller’s ability to train and to manage people. The objective was to encourage people to come to the Enfield office to speak with Scott. The plaintiff answered telephone calls for about six hours per day on most days of the week. At the bottom of the script appears the name Worldwide Marketing Seminars, Inc.
 
 *579
 
 No connection between National and Worldwide Marketing Seminars, Inc., was established.
 

 On March 27, 1991, the plaintiff purchased water filters and other merchandise from National for approximately $5000. National had offered an incentive whereby a purchase of $5000 advanced the purchaser from dealer to direct distributor on the Stairsteps of Opportunity. As a direct distributor, the plaintiff became entitled to an increased rebate and to a performance bonus. Acceptance of National’s offer was urged upon the plaintiff and other new dealers by Scott, Fluet and others at the Enfield office who had assisted in recruiting them. The invoices for this transaction recited that the merchandise was shipped to the plaintiff but sold to Fluet, the plaintiff’s direct distributor and, consequently, a member of his upline, who profited from the plaintiffs purchases. On this purchase, the plaintiff received a $500 credit and a rebate of $20.
 

 In the evenings, the plaintiff tried to make direct sales. Of the merchandise he purchased, the plaintiff was able to sell only about $250 worth despite use of the methods supplied by National. The unsold merchandise is languishing in the plaintiffs basement.
 

 In an effort to recruit a downline, the plaintiff placed an advertisement in a newspaper that was a duplicate of the advertisement that had attracted him. The plaintiff thought that the advertisement was deceptive in that it led people to believe that specific jobs were available when, in fact, it was only to get them to come to recruitment meetings. People responded to the plaintiffs advertisement. Some came to a meeting, signed applications and paid the $25 fee. These acts made them members of the plaintiffs downline but they then dropped out and he never heard from them. The plaintiff
 
 *580
 
 attempted to recruit his brother-in-law, who became disinterested after one visit to the Enfield office.
 

 Before placing his advertisement in the newspaper, the plaintiff had read the “Rules For Operation of [A National] Dealership,” which appears on page three of the general information manual. There appears to be nothing in these rules that made the Enfield office anything less than a legitimately rim operation although, from the testimony of Robert Brewster, it appears that other dealerships may be run somewhat differently.
 

 Prior to April, 1993, the state of Connecticut had joined with nine other states in looking into National’s distribution system and its representations to dealers and prospective dealers. Complaints had been filed with the department of consumer protection and had been made to the media. As of April, 1993, there were approximately 1550 people, either Connecticut residents or persons with Connecticut addresses, who had become National dealers and had paid the $25 application fee.
 

 On April 9, 1993, the state filed its complaint, dated April 8, 1993, and returnable on April 27, 1993, in the Superior Court for the judicial district of Hartford-New Britain at Hartford. The complaint alleged violations by National of General Statutes §§ 42-110b (a) and 42-145 respecting unfair or deceptive acts or practices and illegal pyramid schemes. The relief sought included orders for restitution, imposition of civil penalties and permanent injunctions prohibiting National, and anyone acting for or in concert with National, from committing unfair or deceptive acts or practices in connection with the sale, offering for sale, promotion or distribution of National’s products or participating in or assisting others to participate in any contingent transaction scheme. The complaint was filed at the request of the commissioner of consumer protection.
 

 
 *581
 
 Very shortly after the complaint was filed, the state and National entered into a consent judgment. Although National denied any wrongdoing, the judgment enjoined National from certain acts or practices including, inter alia, making deceptive and misleading statements concerning income levels of dealers, closing ratios for sales and product information and tests. The judgment also obligated National to buy at varying prices items offered for repurchase by cancelling dealers whose application fees would be refunded and who, in exchange, would release National from all claims relating to their solicitation into or experience in the National distribution program. Finally, the consent judgment required National to adopt a sales verification program regarding sales to ultimate consumers and a registration and regulatory system for the governance of its dealers and distributors.
 

 In the suit brought by the state, participants in National’s distribution program were permitted to become parties by affirmatively taking advantage of the judgment’s provisions for the repurchase of items previously sold and the refund of application fees. Of the 1550 known participants, only 275 persons opted to participate in the judgment leaving 1275 persons as a potential class. The plaintiff did not join the state’s suit because its “buy-back” provisions would have given him less than one half of the amount he had invested in National’s products. According to National’s records, the plaintiff still owes $500 for products purchased.
 

 At present, there are no claims or suits against National in Connecticut except this one instituted by the plaintiff. There are, however, some pending suits in other jurisdictions. Class action status has been denied for suits in the United States District Court for the Northern District of Illinois and in a New Jersey
 
 *582
 
 state court. The question is pending in a suit known as
 
 Flynn
 
 v.
 
 NSA,
 
 in the United States District Court for the Western District of Tennessee where the claim is that a nationwide class exists.
 

 National is not authorized to conduct business in Connecticut. Fluet, who was the plaintiffs direct distributor, has not been involved in National’s distribution scheme since June, 1991. Scott, the head of the Enfield office, severed connections with the defendant in August, 1991.
 

 Brewster, a successful Connecticut National distributor who is a national marketing director, the top step in the Stairsteps of Opportunity testified that certification of the present case as a class action would have an adverse impact as to him. Brewster’s reasoning was that his part-time dealers would not understand the nature of the class action. In Brewster’s opinion, a class action would affect his and National’s credibility in dealing with his downline.
 

 In the spring of 1992, National changed its marketing plan. Now it is easier to become a direct distributor as only $2000 of merchandise, rather than $5000, has to be purchased. National also, as of 1992, has a buy-back program for its dealers.
 

 II
 

 Before a determination is made regarding whether the plaintiff has established his claim for class action status, some preliminary matters should be discussed. When the propriety of a class action is considered, the question is only whether the requirements set forth in the rules have been met and not whether the moving party has stated a cause of action or will prevail in the end.
 
 Eisen
 
 v.
 
 Carlisle & Jacquelin,
 
 417 U.S. 156, 178, 94 S. Ct. 2140, 40 L. Ed. 2d 732
 
 (1974); Redditt v.Mississippi Extended Care Centers, Inc.,
 
 718 F.2d 1381, 1388
 
 *583
 
 (5th Cir. 1983); see
 
 Campbell
 
 v.
 
 Board of Education,
 
 36 Conn. Sup. 357, 360, 423 A.2d 900 (1980). On the other hand, to decide whether Practice Book §§87 and 88 have been satisfied, it is necessary to examine the substantive claims and defenses asserted. It bears emphasis, however, that there is a distinction between identifying issues that the case will present for the purpose of deciding if class action status is warranted and deciding those issues on their merits.
 
 Cook
 
 v.
 
 Rockwell International Corp.,
 
 151 F.R.D. 378, 381 (D. Colo. 1993).
 

 In deciding whether a case qualifies as a class action, the federal courts have added two implied conditions to those expressly stated in rule 23 of the Federal Rules of Civil Procedure. There must be a class and the class representative must be a member of that class.
 
 Christman
 
 v.
 
 American Cyanamid Co.,
 
 92 F.R.D. 441, 446, 450 (N.D. W. Va. 1981). In the opinions of the Supreme Court of the United States, the two implied conditions are subsumed in the following language: “a class representative must be part of the class and possess the same interest and suffer the same injury as the class members.” (Internal quotation marks omitted.)
 
 General Telephone Co.
 
 v.
 
 Falcon,
 
 457 U.S. 147, 156, 102 S. Ct. 2364, 72 L. Ed. 2d 740 (1982);
 
 East Texas Motor Freight
 
 v.
 
 Rodriguez,
 
 431 U.S. 395, 403, 97 S. Ct. 1891, 52 L. Ed. 2d 453 (1977).
 

 The plaintiffs motion for certification in this court dated November 3, 1995, defines the proposed class as “that class of individuals in Connecticut who responded to [National’s] advertisements and became [National] dealers and/or distributors and who have not accepted the terms of the settlement entered into between defendant and the Attorney General of the state of Connecticut in
 
 State
 
 v.
 
 National Safety Associates, Inc.,
 
 [Superior Court, judicial district of Hartford-New Britain at Hartford, Docket No. 523694 (April 8, 1993)].” At the hearing, National contended that any wrong done
 
 *584
 
 to the plaintiff was caused by independent contractors. The court’s finding in this regard is that the plaintiff knew, when he signed the application form, that Scott and Fluet were independent contractors, but was uncertain as to what that relationship meant. A claim that National is shielded from liability because of an independent contractual set-up with its dealers is clearly a defense on the merits and, at this point, irrelevant to the issues. See
 
 Crowley
 
 v.
 
 Banking Center,
 
 Superior Court, judicial district of Fairfield at Bridgeport, Docket No. CV870237599S (March 6, 1992) (6 Conn. L. Rptr. 134, 136).
 

 Moreover, the language in the plaintiffs amended complaint dated August 23, 1995, is that persons were recruited to become National dealers by National, its employees, agents and servants. The court is able to redefine the class designation to further the utilization of the class action procedure.
 
 Dolgow
 
 v.
 
 Anderson,
 
 43 F.R.D. 472, 492 (E.D.N.Y. 1968), rev’d on other grounds, 438 F.2d 825 (2d Cir. 1971); 7A C. Wright, A. Miller & M. Kane, Federal Practice and Procedure (2d Ed. 1986) § 1759, p. 111. The terms agent and independent contractor are not necessarily mutually exclusive.
 
 Logue
 
 v.
 
 United States,
 
 412 U.S. 521, 527 n.5, 93 S. Ct. 2215, 37 L. Ed. 2d 121 (1973), citing 1 Restatement (Second), Agency § 2 (3) (1958). The definition of the plaintiffs proposed class is, therefore, amended so that it shall read “that class of individuals in Connecticut who responded to advertisements of the defendant, its employees, servants or agents . . . .”
 

 A class is deemed to exist if the general outlines of its membership are determinable at the outset of the litigation.
 
 Cook
 
 v.
 
 Rockwell International Corp.,
 
 supra, 151 F.R.D. 382. Such is the situation here. Not only are the general outlines of membership known, the names and addresses of the specific individuals who could be affected, or most of them, are also known. National has
 
 *585
 
 given the plaintiff a list of National affiliated persons who have not “opted-in” to participate in the settlement provisions of the consent judgment obtained by the attorney general. The plaintiffs membership in the class is evident from the court’s finding of facts.
 

 Ill
 

 In addition to Practice Book §§87 and 88, General Statutes § 42-110g (b) allows CUTPA plaintiffs to bring class actions on behalf of themselves and others similarly situated pursuant to rules established by the judges of the Superior Court. This means, of course, that even though the plaintiffs motion for certification has a statutory source, it is the judge that made Practice Book rules that are controlling. The four requisites specified in Practice Book § 87 and rule 23 are usually identified by the shorthand names of numerosity, commonality, typicality and adequacy.
 
 Feinstein
 
 v.
 
 Firestone Tire & Rubber Co.,
 
 535 F. Sup. 595, 600 (S.D.N.Y. 1982).
 

 There is no magic number for determining whether, in a particular case, joinder of all putative parties will be impracticable.
 
 Arduini
 
 v.
 
 Automobile Ins. Co. of Hartford, Connecticut,
 
 supra, 23 Conn. App. 590;
 
 Campbell
 
 v.
 
 Board of Education,
 
 supra, 36 Conn. Sup. 360. The issue is one to be resolved in light of the facts and circumstances of the case. The plaintiff must show some evidence or a reasonable estimate of the number of class members.
 
 Campbell
 
 v.
 
 Board of Education,
 
 supra, 361.
 

 The plaintiffs evidence is that the class consists of approximately 1275 people. Brewster testified that he, his wife and perhaps his downline would be adverse to bringing claims against National. At this juncture, Brewster’s estimate of nonadversity by a number of dealers is unimportant because it does not establish that most of the potential class members have no claims
 
 *586
 
 to be asserted by the class representative.
 
 Cook
 
 v.
 
 Rockwell International Corp.,
 
 supra, 151 F.R.D. 384. Brewster did not say how many people were in his downline other than to comment that a few of them were on the list that was given to the plaintiff. There is, therefore, no definitive number to subtract from 1275. Even if that number were reduced by one-half, a joinder of all parties plaintiff would be impracticable. Accordingly, the plaintiff has satisfied the numerosity requirement of Practice Book § 87.
 

 Commonality, the second requirement, does not mean that there must be a complete identity of legal and factual issues among all class members. Rather, it requires only that some common questions exist, not even that such questions predominate.
 
 Campbell
 
 v.
 
 Board of Education,
 
 supra, 36 Conn. Sup. 362. The most that commonality needs is the same legal or remedial theory for the class claim.
 
 Jones
 
 v.
 
 DeLeonardis,
 
 145 F.R.D. 480, 483 (N.D. Ill. 1992).
 

 At least two questions common to the class are suggested by the plaintiff: (1) whether the actions of National or its employees, servants or agents in pursuading people to become National dealers constituted unfair or deceptive acts or practices in the conduct of trade or commerce; (2) whether the rebate scheme in National’s Stairsteps of Opportunity is a contingent transaction made illegal by § 42-145. See
 
 State
 
 v.
 
 Bull Investment Group, Inc.,
 
 32 Conn. Sup. 279, 284-88, 351 A.2d 879 (1974).
 

 It may be that if the common questions are proven, differing amounts of damages will be claimed among the class members. Such a scenario of individual questions remaining after common questions have been resolved does not mean that certification should be denied on the ground that commonality is absent.
 
 Cook
 
 v.
 
 Rockwell International Corp.,
 
 supra, 151 F.R.D. 385.
 

 
 *587
 
 The third requirement, typicality, is in many respects similar to commonality. Typicality is satisfied when the representative party’s claim “arises out of the same event or practice that gives rise to the claims of the class members and is based on the same legal or remedial theory.” (Internal quotation marks omitted.)
 
 Campbell
 
 v.
 
 Board of Education,
 
 supra, 36 Conn. Sup. 365.
 

 The claims of the plaintiff and the class he seeks to represent involve the program for which he and they were recruited and the method by which the recruitment was accomplished. Some factual differences have appeared. For example, the court has found that no connection was proven to exist between National and Worldwide Marketing Seminars, Inc., the author of the telephone script used at the Enfield office. The court also finds that Richard Waak, National’s general counsel, testified that National had never authorized or approved a standardized script or method of recruiting. Also, according to Brewster, some of the material utilized at the Enfield office was not used by him before applicants signed on as dealers.
 

 In the court’s view, the differences that were shown are insufficient to detract from what has been presented as a comprehensive recruitment and marketing scheme. Typicality is satisfied where, as in the present case, there is a connection between the claims of the class representative and the common questions of fact or law that unite the class.
 
 Cook
 
 v.
 
 Rockwell International Corp.,
 
 supra, 151 F.R.D. 385. The representative’s claims are only required to be typical of, not identical with, the claims of other class members. “When the claim arises out of the same legal or remedial theory, the presence of factual variations is normally not sufficient to preclude class action treatment.”
 
 Carpenters Local 899
 
 v.
 
 Phoenix Associates,
 
 152 F.R.D. 518, 522 (S.D. W. Va. 1994).
 

 
 *588
 
 Adequacy, the fourth and final requirement of Practice Book § 87, is measured by two standards. First, the attorney for the class must be qualified, experienced and generally able to conduct the litigation. “Second, the class members must not have interests that are ‘antagonistic’ to one another.”
 
 In re Drexel Burnham Lambert Group, Inc.,
 
 960 F.2d 285, 291 (2d Cir. 1992). The issue of whether the plaintiff and his attorney will fairly and adequately protect the interests of the class has due process ramifications. As expressed by one court, “[t]he potential res judicata, or at least collateral estoppel effect of any judgment in the [class] action makes it imperative that the absent members on whom it works will not be deprived of their day in court.”
 
 Harriss
 
 v.
 
 Pan American World Airways, Inc.,
 
 74 F.R.D. 24, 43 (N.D. Cal. 1977). Our Supreme Court in
 
 Barrett
 
 v.
 
 Southern Connecticut Gas Co.,
 
 172 Conn. 362, 373, 374 A.2d 1051 (1977), a derivative shareholders’ action, noted that in a representative suit the judgment would operate as res judicata only on those unnamed parties whose interests had been adequately protected. See also
 
 Campbell
 
 v.
 
 Board of Education,
 
 supra, 36 Conn. Sup. 366-67;
 
 Governors Grove Condominium Assn., Inc.
 
 v.
 
 Hill Development Corp.,
 
 35 Conn. Sup. 199, 202, 404 A.2d 131 (1979).
 

 The defendant has no objection to the plaintiffs attorney as counsel for the class if the case is certified. For a variety of reasons, however, strong objections are made to the plaintiff as a representative party. These objections go to the scope, nature and extent of the plaintiffs National experience. National contends that the plaintiffs dealings with two independent contractors in one office for a few months is too limited for him to be the representative party, that the plaintiffs interest is antagonistic to the welfare of the putative class in that he placed an advertisement in a newspaper that was almost identical to the advertisement he now
 
 *589
 
 complains was deceptive, or that the plaintiffs interest is antagonistic to the rest of the putative class because in the dealer application form that he signed, he agreed to abide by the “Rules for Operation of [a National] Dealership” and to indemnify and hold National harmless from any claims arising from his breach of the rules. National also contends that the plaintiff cannot be the class representative and that the case should not be certified as a class action because of reliance upon primarily oral representations.
 

 With each of these propositions, the court disagrees. Previously mentioned was the kinship existing between the requirements of commonality and typicality. Not only do commonality and typicality tend to come together, they also tend to merge with the adequacy of representation requirement.
 
 Avagliano
 
 v.
 
 Sumitomo Shoji America, Inc.,
 
 103 F.R.D. 562, 583 (S.D.N.Y. 1984). The signing of the dealer application form does not place the plaintiff in an adverse position since the same form would have been signed by all class members. If the plaintiffs newspaper advertisement becomes a problem, the court, at a later date, can replace him with another representative party or add other more typical class representatives or form subclasses.
 
 In re Lilco Securities Litigation,
 
 111 F.R.D. 663, 673 (E.D.N.Y. 1986). Although actions based substantially on oral rather than written representations have generally been considered as inappropriate for class action treatment;
 
 Seiler v. E. F. Hutton & Co.,
 
 102 F.R.D. 880, 888 (D.N.J. 1984); the oral representations in the present case were part of a presentation in which written and videotaped material prepared by or for National was shown to new dealers and prospective new dealers. Under such circumstances, class action treatment is proper.
 
 Rishcoff
 
 v.
 
 Commodity Fluctuations Systems, Inc.,
 
 111 F.R.D. 381, 384 (E.D. Pa. 1986).
 

 
 *590
 
 A class representative has the responsibility of pursuing a resolution of the case for the benefit of the class.
 
 Avagliano v. Sumitomo Shoji America, Inc.,
 
 supra, 103 F.R.D. 583. But the class representative is not required to be a legal expert;
 
 Trautz
 
 v.
 
 Weisman,
 
 846 F. Sup. 1160, 1168 (S.D.N.Y. 1994); nor even a sophisticated person.
 
 Surowitz
 
 v.
 
 Hilton Hotels Corp.,
 
 383 U.S. 363, 366, 86 S. Ct. 845, 15 L. Ed. 2d 807 (1966);
 
 Heastie
 
 v.
 
 Community Bank of Greater Peoria,
 
 125 F.R.D. 669, 676-77 (N.D. Ill. 1989). All that is necessary is that the representative party have some minimal level of interest in the case, familiarity with the challenged practices and an ability to assist in decision-making in the conduct of the litigation.
 
 Diduck
 
 v.
 
 Kaszycki & Sons Contractors, Inc.,
 
 149 F.R.D. 55, 59-60 (S.D.N.Y. 1993). The plaintiff was shown to possess these attributes. The court notes that National’s attacks on the plaintiffs suitability do not mention his financial resources. See
 
 Trautz
 
 v.
 
 Weisman,
 
 supra, 1167.
 

 IV
 

 Having concluded that all four requirements of Practice Book § 87 have been satisfied, the court must decide whether the same situation exists with respect to the two components of Practice Book § 88; predominance and the superiority of a class action over other methods of adjudication. Predominance is a stricter test than previously discussed commonality. It requires not only that questions common to the class exist but also that they predominate over issues that would relate to only individual members.
 
 Campbell
 
 v.
 
 Board of Education,
 
 supra, 36 Conn. Sup. 368;
 
 Sollenbarger
 
 v.
 
 Mountain States Telephone & Telegraph Co.,
 
 121 F.R.D. 417, 423 (D.N.M. 1988). As a criterion, however, predominance is applied in a pragmatic sense. When common questions represent a significant aspect of a case so that they can be resolved for all class members in a
 
 *591
 
 single suit, predominance exists.
 
 McClendon
 
 v.
 
 Continental Group, Inc.,
 
 113 F.R.D. 39, 43-44 (D.N.J. 1986); 7A C. Wright, A. Miller & M. Kane, supra, § 1778, pp. 528-29.
 

 Previously discussed was the existence of two common questions. Namely, whether the actions of National or its employees, servants or agents in persuading people to become National dealers constituted unfair or deceptive acts or practices in the conduct of trade or commerce and whether the rebate scheme in National’s Stairsteps of Opportunity is a contingent transaction made illegal by § 42-145. These questions are controlling in the litigation. At this juncture, the individual questions would appear to involve only specific damage amounts. Predominance has, therefore, been established.
 

 Since common issues have been found to predominate, a class action appears to be the most expeditious way to resolve the litigation.
 
 Campbell
 
 v.
 
 Board of Education,
 
 supra, 36 Conn. Sup. 370, contains a list, taken from a federal case, of reasons why the class action procedure would be preferable. The reasons, as applicable to the present state suit, are as follows: (1) the alleged economic injuries to many proposed class members may be too minuscule to justify their independent commencement of actions — the plaintiff is seeking $5000 damages — other class members may be entitled to less; (2) a class action would prevent other lawsuits eliminating duplicative efforts by litigants and the judiciary along with duplicative costs and fees; and, (3) inconsistent judicial decisions may be avoided. Id.
 

 Alternatively, the class appears to be too numerous for an effective joinder pursuant to Practice Book § 85 and General Statutes §§ 52-101 and 52-102. Joinder in the form of voluntary opting-in was tried in
 
 State
 
 v.
 
 National Safety Associates, Inc.,
 
 supra, Superior Court,
 
 *592
 
 Docket No. 523694, with less than desired results. Aside from joinder, there appears to be no way to proceed in multiparty litigation except by a class action. The other alternative mentioned in
 
 Campbell
 
 v.
 
 Board of Education,
 
 supra, 36 Conn. Sup. 371, is the “test case” approach adopted by the United States Court of Appeals for the Third Circuit in
 
 Katz
 
 v.
 
 Carte Blanche Corp.,
 
 496 F.2d 747 (3d Cir.), cert. denied, 419 U.S. 885, 95 S. Ct. 152, 42 L. Ed. 2d 125 (1974), whereby the class was certified and the class action stayed while one litigant went forward on the issue of liability. The decision contains several dissents and the court doubts that it comports with Connecticut procedure. General Statutes § 52-105 (numerous parties may be represented by one) has been construed as permitting a class action.
 
 Jones
 
 v.
 
 Foote,
 
 165 Conn. 516, 520, 338 A.2d 467 (1973).
 

 The court concludes that both aspects of Practice Book § 88 have been established. Because National’s brief, however, mentions persons who allegedly have settled with National apart from the persons who joined as parties in
 
 State
 
 v.
 
 National Safety Associates, Inc.,
 
 supra, Superior Court, Docket No. 523694, some further refinement of the designated class will be necessary as discussed in part VI of this opinion.
 

 V
 

 Finally, National’s suggestion that the plaintiff is disqualified from being the class representative because his claim is barred by the three year statute of limitations must be discussed. Under Connecticut procedure, Practice Book § 164, the statute of limitations is a special defense. An inquiry into a claimed affirmative defense such as the statute of limitations is held by the federal courts to be an impermissible intrusion into the class certification analysis required by rule 23 of the Federal Rules of Civil Procedure.
 
 Cook
 
 v.
 
 Rockwell International Corp.,
 
 supra, 151 F.R.D. 386;
 
 Rishcoff
 
 
 *593
 
 v.
 
 Commodity Fluctuations Systems, Inc.,
 
 supra, 111 F.R.D. 382. The same analogy should apply to a class action suit brought in the state system.
 

 VI
 

 The class is certified in the following terms: That class of persons in Connecticut who responded to advertisements of National, its employees, servants or agents and who have not accepted the terms of settlement entered into between the attorney general of the state of Connecticut and National in a case known as
 
 State
 
 v.
 
 National Safety Associates, Inc.,
 
 supra, Superior Court, Docket No. 523694, or otherwise released National and withdrawn from its distribution system.
 

 Notice of the class action suit shall be given by registered or certified mail, return receipt requested, to every class member for whom an address is known. In additon, notice by publication shall be placed once in a daily newspaper published in Stamford, Bridgeport, New Haven, Waterbury, Middletown, New London, Norwich, Willimantic, Hartford and Torrington.
 

 The notice shall advise each class member that: (1) the court will exclude a member from the class if the member so requests by a specified date; (2) the judgment, whether favorable or not, will include all members who do not request to be excluded; and, (3) any member who does not request to be excluded may, if the member desires, enter an appearance through counsel.
 

 Counsel for the plaintiff shall prepare the notice and submit it to counsel for National and the court on or before March 4, 1996. If counsel for National desires to be heard on any item in the notice, he shall arrange with the clerk for a hearing on either March 11 or March 18, 1996.
 

 
 *594
 
 The court’s decision to grant class action status is tentative in the sense that if, at any time, it appears that the representation is inadequate to protect fairly the interests of absent class members, a decertification may be ordered as provided in Practice Book § 90.