## MICHAEL PERUTA ET AL. *v.* OUTBACK STEAKHOUSE OF FLORIDA, INC.

Superior Court, Complex Litigation Docket at Waterbury
File No. X01-CV-04-4001683S

Memorandum filed August 24, 2006

*Madsen & Prestley & Parenteau, LLC, Hayber & Pantuso, LLC*, and *Consumer Law Group, LLC*, for the named plaintiff et al.

*Jackson Lewis, LLP*, for the defendant.

SHEEDY, J. Former employees of the defendant, Outback Steakhouse of Florida, Inc., bring this action on behalf of themselves and other current or former employees of the defendant's seven Outback Steakhouse restaurants in Connecticut who worked as food servers (servers) from June 2, 2002, to the present. They claim to have been underpaid in violation of the Connecticut Minimum Wage Act (act), General Statutes § 31-58 et seq., and § 31-62 E1 et seq. of the Regulations of Connecticut State Agencies. The class is said to consist of "certainly well over 200 or 300 individuals." The defendant has objected; both parties have filed memoranda of law with extensive attachments, and oral argument was heard on June 6, 2006.

The named plaintiff, Michael Peruta, and coplaintiffs Malia Fontaine and Caragh Silverio, all of whom were employed at the Newington Outback Steakhouse restaurant, bring individual claims in counts one through three of the first amended complaint (complaint). Count four asserts the class action claim and alleges three violations. First, the defendant took the tip credit of 29.3 percent of the state mandated minimum wage (presently $7.40 per hour) for all hours worked when it was not so entitled. Second, the defendant failed to segregate the servers' time spent on "nonservice" duties from time spent performing "service" duties or to obtain from the servers signed tip statements as mandated by §§ 31-62-E2 (c) and 31-62-E3 (c) of the Regulations of Connecticut State Agencies. Third, and finally, because the defendant required the servers to "tip out,"[1] it exercised control over the servers' tips and deprived them of gratuities. As a result, the servers claim, they were not "service employees" under § 31-62-E2 (c) of the

---

[1] "Tipping out" is a practice whereby the servers pay a portion of their tips to other employees such as bartenders, hostesses, expediters and the like. The defendant argues that the practice was not mandatory, as the plaintiffs claim, but that it was voluntary.

aforementioned regulations, and the defendant was not, therefore, entitled to take the tip credit.

## I

## CERTIFICATION STANDARDS

The plaintiffs' burden is to demonstrate that the prospective class meets the requirements of both Practice Book § 9-7 (numerosity, commonality, typicality and adequacy of representation) and Practice Book § 9-8. Specifically, under Practice Book § 9-8, it must be demonstrated "that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." In adjudicating this motion, the "court is bound to take the substantive allegations of the complaint as true." (Internal quotation marks omitted.) *Rivera* v. *Veterans Memorial Medical Center*, 262 Conn. 730, 743, 818 A.2d 731 (2003). Although the question for the court on a motion for class certification "is not whether the plaintiff or plaintiffs have [either] stated a cause of action or will prevail on the merits, but rather whether the [class action] requirements . . . are met"; (internal quotation marks omitted) *Eisen* v. *Carlisle & Jacquelin*, 417 U.S. 156, 178, 94 S. Ct 2140, 40 L. Ed. 2d 732 (1974); that determination "generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiffs' cause of action"; (internal quotation marks omitted) *General Telephone Co. of the Southwest* v. *Falcon*, 457 U.S. 147, 160, 102 S. Ct. 2364, 72 L. Ed. 2d 740 (1982); and it may sometimes be necessary "to probe behind the pleadings before coming to rest on the certification question." Id. Doubts regarding the propriety of certifying a class should be resolved in favor of certification. *Rivera* v. *Veterans Memorial Medical Center*, supra, 743. Because the requirements of our statutes are similar to those of rule 23 of the

Federal Rules of Civil Procedure, we look to federal law in construing the prerequisites of Practice Book §§ 9-7 and 9-8. *Collins* v. *Anthem Health Plans, Inc.*, 275 Conn. 309, 322, 880 A.2d 106 (2005).

The plaintiffs have the heavy burden of establishing that each requirement is satisfied. *McKernan* v. *United Technologies Corp.*, 120 F.R.D. 452, 453 (D. Conn. 1988). Once, however, there has been a preliminary legal showing that such requirements have been met, it is the defendant's burden to demonstrate otherwise. See 2 H. Newberg, Class Actions (3d Ed. 1992) § 7.22, pp. 7-74 and 7-75.

## II

## ADJUDICATION

### A

### Numerosity Requirement Under Practice Book § 9-7

Numerosity is established if the class is too large to make joinder of all members feasible. No "magic number" serves as a bright line guide to measure the fulfillment of this requirement because "numerosity is tied to the impracticality of joinder under the particular circumstances of the case." *Arduini* v. *Automobile Ins. Co. of Hartford, Connecticut*, 23 Conn. App. 585, 590, 583 A.2d 152 (1990). Though speculation about the size of the class will not suffice; id.; an estimate based on reasonable inferences drawn from available facts satisfies the requirement—particularly where, as here, more precise information is within the defendant's control. The record indicates that each of the seven Outback Steakhouse restaurants employed about forty servers at a time. Counsel's estimate of class size (200 to 300) suggests the impracticality of joinder and, thus, the existence of a class. See, e.g., *Hirschfield* v. *Stone*, 193 F.R.D. 175, 182 (S.D.N.Y. 2000) (numerosity established where plaintiffs estimated 150 to 170 class members). The numerosity requirement is satisfied here.

B

Commonality Requirement Under Practice Book § 9-7

"The threshold of commonality is not high." (Internal quotation marks omitted.) *Flanigan* v. *General Electric*, United States District Court, Docket No. 3:93-CV-516 (JBA), 1998 U.S. Dist. LEXIS 22873, *8 (D. Conn. September 28, 1998). It requires only "the same legal or remedial theory for the class claim." *Walsh* v. *National Safety Associates*, 44 Conn. Sup. 569, 584, 695 A.2d 1095 (1996), aff'd, 241 Conn. 278, 694 A.2d 795 (1997) (whether defendant's conduct violated state law presented common question of law). Although both rule 23 (a) (2) and Practice Book § 9-7 (2) reference "questions" (plural), our Supreme Court has said there "need only be one question common to the class." *Collins* v. *Anthem Health Plans, Inc.*, supra, 275 Conn. 323. The present case turns on the claimed existence of general practices by Outback Steakhouse in violation of Connecticut's wage laws; where, as here, it is asserted that the violations affected all servers, a claim the court is bound to accept as true for certification purposes, the commonality requirement is satisfied. See, e.g., *Reep* v. *Barco Auto Leasing Corp.*, United States District Court, Docket No. 3:94-CV-798 (JBA), 1997 U.S. Dist. LEXIS 22400, *5 (D. Conn. August 28, 1997) (if challenged practice is a practice of general applicability, then it necessarily affects the entire plaintiff class [internal quotation marks omitted]). "[T]he fact that class members must individually demonstrate their right to recover, or that they may suffer varying degrees of injury, will not bar a class action [on commonality grounds]." (Internal quotation marks omitted.) *Collins* v. *Anthem Health Plans, Inc.*, supra, 326.

C

Typicality Requirement Under Practice Book § 9-7

Typicality requires that the claims of the representative parties arise out of the same event or practice as

gives rise to the class members' claim and that they be based on the same legal or remedial theory (It is, therefore, in many respects similar to commonality.) "When it is alleged that the same unlawful conduct was directed at or affected both the named plaintiff and the class sought to be represented, the typicality requirement is usually met irrespective of minor variations in the fact patterns underlying individual claims." (Internal quotation marks omitted.) *Duprey* v. *Dept. of Motor Vehicles*, 191 F.R.D. 329, 337 (D. Conn. 2000), citing *Robidoux* v. *Celani*, 987 F.2d 931, 937 (2d Cir. 1993).

The defendant asserts that this requirement cannot be met because, while the proposed class includes servers employed at all seven restaurants located throughout the state,[2] all three of the aforementioned plaintiffs have been employed only at the Newington restaurant. The evidence (provided in the form of exhibits to memoranda) is that each Connecticut restaurant is run by a managing partner who has the authority to hire, fire and assign work shifts and job duties. Scant information is provided with regard specifically as to how what may be "nonservice" duties are assigned or performed at each of the restaurant locations other than Newington, whether servers were required to "tip out" in each of the other locations and the like. None of the plaintiffs here have any personal knowledge regarding specifically how those other locations were in fact run by their respective general managers. The plaintiffs cannot sustain their burden of demonstrating that the same event or practice occurred at all seven restaurants.[3] The typicality requirement is, however, satisfied if the "class" represented by the plaintiffs in the present case

[2] The other locations are Danbury, Manchester, New London, Orange, Southington and Wilton.

[3] Had there been, for example, a named plaintiff from each of the Outback Restaurant locations, it is likely the court would have found those plaintiffs had common interests with the unnamed class members.

is limited only to former and current employees of the Newington location during the applicable period. If certification were to be granted here, the court would necessarily restrict the class to Newington servers during the identified time period. See *Macomber* v. *Travelers Property & Casualty Corp.*, 277 Conn. 617, 633, 894 A.2d 240 (2006) ("[w]ithout individual standing to raise a legal claim, a named representative does not have the requisite typicality to raise the same claim on behalf of a class").

D

Adequacy of Representation Requirement
Under Practice Book § 9-7

This requirement is satisfied if "the representative parties will fairly and adequately protect the interests of the class." Practice Book § 9-7. This standard is met when the representatives: "(1) have common interests with the unnamed class members; and (2) will vigorously prosecute the class action through qualified counsel." *Collins* v. *Anthem Health Plans, Inc.*, supra, 275 Conn. 326. The inquiry's aim is to reveal conflicts of interest between the named plaintiffs and the class they seek to represent. Id., 326–27.

There is an additional concern here in that two of the three aforementioned plaintiffs presently reside[4] in Florida.[5] Curiously, the plaintiffs do not respond to this argument in their reply brief and, thus, the court is without any information with regard to how helpful the Florida residents will be in the prosecution of the case. If, at trial, the nonparticipation by Peruta and Fontaine

[4] At his deposition in March, 2005, Peruta testified that he had then been living in Florida for six months and did not plan to move back to Connecticut "anytime in the near future" but "quite possibly could do so in the future."

[5] Fontaine was not asked whether she planned on returning to Connecticut.

is clear, Silverio, the sole remaining plaintiff, can prosecute the action on behalf of current and former Newington employees. At present, there are no attacks on the competency of the plaintiffs' counsel to prosecute this matter, and the court knows of no conflicts of interest between the three aforementioned plaintiffs and the class (which would be restricted to Newington Outback Steakhouse employees). There is adequacy of representation.

### E

### Predominance Requirement of Practice Book § 9-8

"[C]lass-wide issues predominate if resolution of some of the legal or factual questions that qualify *each class member's case* as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof." (Emphasis in original; internal quotation marks omitted.) Id., 329. That requires a consideration of "what value the resolution of [each] class-wide issue will have in *each class member's* underlying cause of action." (Emphasis added; internal quotation marks omitted.) Id., 329–30. "Common issues of fact and law predominate if they ha[ve] a direct impact on every class member's effort to establish liability and on every class member's entitlement to . . . relief." (Internal quotation marks omitted.) Id., 330. "[When], after adjudication of the class-wide issues, [the] plaintiffs must still introduce a great deal of individualized proof or argue a number of individualized legal points to establish most or all of the elements of their individual[ized] claims, such claims are not suitable for class certification." (Internal quotation marks omitted.) Id. Thus, although the trial court cannot conduct an inquiry into the merits of the case, the court must undergo a practical analysis of the kinds of proof required at trial if the class is certified. *Collins* makes

clear that the court must undergo a three part analysis; it must (1) review the elements of the causes of action asserted on behalf of the putative class; (2) determine whether generalized evidence can be offered to prove those elements on a classwide basis or whether individualized proof is needed to establish each member's entitlement to relief; and (3) weigh the common issues subject to generalized proof against the issues requiring individualized proof to determine which predominate. Id., 331–32. The predominance test is satisfied only if most of the litigants' and the court's efforts will be on common questions of law or fact. Id.

The plaintiffs state that their generalized proof with regard to the claim that the defendant failed to obtain and maintain weekly tip statements in violation of § 31-62-E2 (c) of the Regulations of Connecticut State Agencies consists of deposition excerpts claimed as "admissions." That portion of Tony Scacca's testimony to which the court is referred does not constitute an admission; it is evidence only that the servers daily declared their tips on a checkout form and, when they clocked out, they entered the same in a computer. That testimony is corroborated by Kyle Lancaster and Joseph Kadow.[6] What is relevant to this alleged violation is whether the defendant used the information the servers have provided in the computer and on a checkout form completed daily to keep and maintain weekly tip statements in violation of the applicable regulation. Regarding the defendant's alleged failure to record tip credit amounts claimed and to obtain and maintain signed statements as required under § 31-62-E3 (b) of the Regulations of Connecticut State Agencies,[7] the plaintiffs

[6] In the plaintiffs' supporting memorandum, there are scattered references to suggest these individuals are managers at various locations.

[7] The defendant denies the allegation and points to the electronic signatures—which does not address all aspects of the regulation.

state only that such facts "will be easily demonstrated through generalized evidence in the form of admissions by [d]efendant's management, and an examination of the 'wage record.' " No elucidation is provided. Generalized proof that the defendant exerts control over the servers' tips (and thereby prevents the servers from directly receiving their tips as required under § 31-62-E2 [e] of the Regulations of Connecticut State Agencies) by obligating them to share tips with support staff will consist, the plaintiffs claim, of a written policy statement by Outback Steakhouse of that requirement, the testimony of Outback Steakhouse managers and excerpted deposition testimony by individuals whose roles are not identified but are presumed to be managers assigned to various restaurant locations. Finally, the plaintiffs state that the generalized proof that the defendant failed to segregate "service" from "nonservice" duties of the servers in violation of § 31-62-E4 of the Regulations of Connecticut State Agencies will consist of a multiplicity of corporate documents (memoranda, policy statements, portions of a server training outline, and the like) and deposition excerpts.[8]

As to what constitutes "service" and "nonservice" duties, the plaintiffs agree that that will be a function of the court, presumably to be made following the admission of documents into evidence as exhibits, most of which were created by individual Outback Steakhouse managers or corporate staff and which were provided in discovery. At trial, the plaintiffs plan to use such documents as a memorandum entitled "Sidework"; that memorandum includes activities such as "brew coffee and tea," "refill ice at soda machine," "stock rameikins," and the like. They urge the restriction of "service duties" to those activities "related to the

[8] *No* transcript excerpts have been certified, and the opening pages of the transcripts have not been provided, making identification of deponents difficult at best and sometimes impossible.

guests seated at the tables in their (servers') immediate service area, which is comprised of two or three tables."[9] (The deponent, Wayne Hull, is "presumed" to be an Outback Steakhouse employee at some level of management.)

The identification of "service" and "nonservice" duties is critical to the resolution of many of the plaintiffs' claims. Neither our state's General Statutes nor the Regulations of Connecticut State Agencies define the terms, and no decisional law defines those terms as applicable to servers. Section 31-62-E2 (e) of the Regulations of Connecticut State Agencies, however, defines "service employee" as one "whose duties relate solely to the serving of food and/or beverages to patrons seated at tables or booths and to the performance of duties *incidental to such service* and who customarily receive gratuities." (Emphasis added.) The defendant argues that the regulation requires an expansive interpretation such that "service" be read to include functions other than waiting on customers (as the plaintiffs state). If the evidence at trial prompts the court to adopt the definition of "service employee" stated in § 31-62-E2 (e) of the Regulations of Connecticut State Agencies, "nonservice" duties are necessarily those that either (1) do not "relate solely to the serving of food [and] beverages"; or (2) do not relate "to the performance of duties incidental to such service . . . ." Id. Since it is apparently conceded that the defendant took the tip credit for all hours worked by a server, a class member suffers a loss only if he or she performed "nonservice" duties for any of the hours for which Outback Steakhouse took the tip credit. Additionally, if a server performed both "service" and "nonservice" duties and

[9] The defendant has argued that this sidework assignment sheet is used exclusively at the Orange location (no longer relevant in the trial of the present case) and that four of the five managers deposed had never before seen the document before their depositions. Ditto the server training online, which three managers had not seen prior to their depositions.

the time spent on each is definitely segregated and recorded as such, "the allowance for gratuities as permitted as part of the minimum fair wage may be applied to the hours worked in the service category." Regs., Conn. State Agencies § 31-62-E4. Conversely, if a server performs both "service" and "nonservice" duties and the time spent on each cannot be definitively segregated and recorded or is not so segregated and recorded, "no allowances for gratuities may be applied as part of the minimum fair wage." Id. The centerpiece of the plaintiffs' case is the claim that it was the uniform practice of the defendant to assign servers "running duties" and that that practice, coupled with its claimed failure to segregate time spent on those "nonservice" duties, precludes the defendant's taking of the tip credit.

The task in adjudicating this motion is to determine whether, in the trial of this matter, most of the litigants' and the court's efforts will be on common questions of law or fact subject to generalized evidence or whether the issues requiring individualized proof will predominate. *Collins* v. *Anthem Health Plans, Inc.*, supra, 275 Conn. 332. With that inquiry in mind, each claimed violation of the act needs to be analyzed.

The act (General Statutes § 31-60 [b]) prohibits employers from paying employers less than the minimum fair wage. Section 31-60 (b) further provides that employers in the hotel and restaurant industry may take the tip credit and pay an hourly wage 29.3 percent less than the currently mandated minimum "for persons, other than bartenders, who are employed in the hotel and restaurant industry . . . who customarily and regularly receive gratuities." The statute vests authority with the commissioner of the department of labor to adopt regulations as may be appropriate to effectuate the intent of the act. Pursuant to that authority, the regulations adopted are codified as § 31-62-E1 et seq. of the Regulations of Connecticut State Agencies. Under

the regulations, several requirements must be met before an employer may take the "tip credit" as against the minimum wage paid "service employees."[10] Specifically, the employer must obtain and maintain a signed statement from the employee certifying that he or she has received gratuities of at least $2 per day (for part-time employees) or $10 per week (for full-time employees). Regs., Conn. State Agencies § 31-62-E2 (c). The employer must weekly record the amount claimed as credit as a separate item in the wage record. Regs., Conn. State Agencies § 31-62-E3 (b). Section 31-62-E2 (e) of the Regulations of Connecticut State Agencies further provides that the tips must be "received by the employee directly from a guest, patron or customer for service rendered" before the employer can take the tip credit.[11] Finally, the employer must "segregate" time spent by the employee on "service" and "nonservice" duties as discussed previously. Regs., Conn. State Agencies §§ 31-62-E2 (c) and 31-62-E4.

The plaintiffs cite as authority for their argument *Macarz* v. *Transworld Systems, Inc.*, 193 F.R.D. 46 (D. Conn. 2000), in which the court noted the predominance requirement often focuses on the liability issue "and if the liability issue is common to the class, common questions are held to predominate over individual questions." (Internal quotation marks omitted.) Id., 54. *Macarz* was brought under the Fair Debt Collection Practices Act; 15 U.S.C. 1692 et seq.; the plaintiffs there had received collection letters that the District Court had already found to be in violation of that act. The

[10] As just previously stated, § 31-62-E2 (c) of the Regulations of Connecticut State Agencies defines a "[s]ervice employee" as one "whose duties relate solely to the serving of food and/or beverages to patrons seated at tables or booths and to the performance of duties incidental to such service, and who customarily receive gratuities."

[11] A department of labor guide provides that, for tips to be received directly, they must be "paid directly" to the employee, and the employer may not exert any control over them.

court granted the motion for certification, noting that the predominance requirement was "a test readily met in certain cases alleging consumer or securities fraud or violations of the antitrust laws." (Internal quotation marks omitted.) *Macarz* v. *Transworld Systems, Inc.*, supra, 193 F.R.D. 54. The court also noted that the defendant there did not seriously challenge the predominance element and, curiously, noted that "damage amounts may vary . . . ." Id.[12] One paragraph in the thirteen page decision addressed predominance.

The present case is unlike *Macarz* in multiple ways. It is not a consumer or securities fraud case, nor does it allege an antitrust violation. The centerpiece of this action is not a "common document"; id.; such as the letter sent to all 15,000 proposed class members and consumers in *Macarz* but, as the plaintiffs concede, a variety of documents relative to the listing of side duties and the performance of that sidework, the alleged corporate policy regarding the taking of the tip credit and Outback Steakhouse's alleged requirement that servers "tip out." Nor is there here, as there was in *Macarz*, a prior court finding of a prohibited practice which was subsequently repeated (15,000 times) and a ruling on which the class was "entitled to rely" so as to preclude the defendant from relitigating liability. *Macarz* v. *Transworld Systems, Inc.*, supra, 193 F.R.D. 49. Liability here is not only to be established but is aggressively contested by Outback Steakhouse. The plaintiffs have provided the court with approximately forty documents as exhibits to their memorandum, many of which, the defendant asserts, are either not relevant to practices at the Newington Outback Steakhouse or do not establish the violations of the act asserted. The case before this court is simply not "served up" in the same way

---

[12] What is "curious" is that all the plaintiffs received the same letter; thus, it would appear that variation in damages would likely be attributed to some plaintiffs having retained counsel prior to the class action having been brought.

as is *Macarz* absent the undisputed "standardized conduct" in the federal case. Id., 50. Given the unusual circumstances of a prior finding of a statutory violation which precluded the defendant's contesting of liability in *Macarz*, the finding of predominance there followed naturally.

The plaintiffs here have asserted specific violations of the act regarding Outback Steakhouse's taking of the tip credit for each hour of each server's work. Before any violations can be established, the court must first grapple with the issue of "service" versus "nonservice" duties. (If, for example, all duties performed by the servers are "service" duties because they are "incidental" to the service of patrons, no violation of the act for failure to segregate under § 31-62-E4 of the Regulations of Connecticut State Agencies is established. If, however, "service" is limited to duties performed at tables "in the immediate service area" of the servers, the plaintiffs may be able to establish such violation.) The plaintiffs assert that this issue may be adjudicated by "generalized proof" to consist of such exhibits (offered through Newington managers, presumably) as the earlier referenced lists of sidework duties and job descriptions without evidence of what work the servers performed daily at the Newington restaurant. The court is puzzled as to how a mere listing of "sidework" duties or the suggested "service" and "nonservice" jobs listing in a guide published by the department of labor's wage and workplace standards division can be determinative of the issue, as the plaintiffs suggest. It needs first to be said that the aforementioned guide is no more than a guidebook, which, as the director of the standards division notes, "does not take the place of actual Connecticut General Statutes and regulations and/or court decisions." When an administrative "agency's determination of a question of law has not previously been

subject to judicial scrutiny . . . the agency is not entitled to special deference" in its interpretation of legal terminology. (Internal quotation marks omitted.) *Cendant Corp.* v. *Commissioner of Labor*, 276 Conn. 16, 26, 883 A.2d 789 (2005). "[I]t is for the courts, and not administrative agencies, to expound and apply governing principles of law." (Internal quotation marks omitted.) Id. If, in the absence of any decisional or statutory law defining "service" and "nonservice," duties, this court chooses to rely on the guide's suggested listing, on what evidence would the court determine whether the *Newington* servers were required to perform the suggested "nonservice" duties[13] without testimony from class members? Further, if the court chooses to look to the federal tip credit law (in view of Connecticut's silence on the issue), the United States Department of Labor's fact sheet no. 15, a "guide" which addresses the treatment of tipped employees under the Fair Labor Standards Act; 29 U.S.C. § 201 et seq.; has this to say about servers performing nonservice duties: "When an employee is employed concurrently in both a tipped and a non-tipped occupation, the tip credit is available only for the hours spent in the tipped occupation. The [Fair Labor Standards] Act permits an employer to take the tip credit for time spent in duties related to the tipped occupation, even though such duties are not by themselves directed toward producing tips, provided such duties are incidental to the regular duties and are generally assigned to such occupations. Where tipped employees are routinely assigned to maintenance, or where tipped employees spend a substantial amount of time (in excess of 20 percent) performing general

---

[13] Those "suggestions" consist of cleaning the restrooms, preparing food, washing dishes, showing all patrons to their seats (as opposed to showing only patrons within a server's service area), doing general setup work before the restaurant opens, general cleaning work, kitchen cleanup and waiting on takeout customers. Deposition testimony from the plaintiffs suggests that there were other staff members to perform those duties at the Newington location.

preparation work or maintenance, no tip credit may be taken for the time spent in such duties." United States Department of Labor, employment standards administration wage and hour division, "Fact Sheet No. 15: Tipped Employees Under the Fair Labor Standards Act (FLSA)," at http://www.dol.gov/esa/regs/compliance/whd/whdfs15.htm.

In a trial of this matter, assuming the court were to conclude that the servers performed both "service" and "nonservice" duties, as the plaintiffs urge, how would it determine what percentage of the servers' tasks were "nonservice" and consumed more than 20 percent of their time, thus prohibiting Outback Steakhouse's taking of the tip credit for those hours without hearing the testimony of class members? To conclude, as the plaintiffs do, that the situation before this court is like that in *Scott* v. *Aetna Services, Inc.*, 210 F.R.D. 261 (D. Conn. 2002), is to ignore that, in *Scott*, there was a working definition of "[s]ystems [e]ngineer"—provided by the defendant—and, once having concluded that the job duties of the proposed class of systems engineers were "of the same type"; id., 265;[14] it was a facile transition to adjudicate whether the claimed failure to pay each worker overtime compensation constituted a violation of the act—and thus to find that predominance could be established by generalized proof. To suggest this court's interpretation of "service" versus "nonservice" duties can or should be premised solely on a guidebook's "sample" listings or on the defendant's description of "sidework" is impermissibly to restrict the court's analysis on an issue which goes to the very heart of this case—the defendant's entitlement to take the tip credit.

---

[14] It is this difference between *Scott* v. *Aetna Services, Inc.*, supra, 210 F.R.D. 261, and the present case which distinguishes the two cases, and both counsels' argument with regard to whether this is a misclassification case does not, under these circumstances, further the predominance analysis.

The court is persuaded that the claimed violation of failing to segregate service and nonservice duties cannot be established by generalized proof. The extensive individualized proof required to arrive at the meaning of those terms in the context of restaurant duties predominates over whatever generalized proof the plaintiffs might offer on this issue.

The plaintiffs assert in count four of their complaint that the defendant failed to obtain and to maintain weekly tip statements from servers and thus violated §§ 31-62-E2 (c) and 31-62-E3 (b) of the Regulations of Connecticut State Agencies because it did not record the amount of gratuities claimed as a tip credit against the minimum wage. Further, they also allege that the defendant violated § 31-62-E3 (c) of the Regulations of Connecticut State Agencies by not obtaining and maintaining signed statements from the servers certifying that they had in fact received at least $2 per day (if part-time servers). The plaintiffs intend to demonstrate these claimed violations "through generalized evidence in the form of admissions by [d]efendant's management, and an examination of the 'wage record.' " The plaintiffs specifically point to excerpted (and uncertified) deposition testimony by Lancaster, Scacca and Kadow as proof of such admissions. Nothing in the plaintiffs' submission of these documents informs the court at what locations (or when) these individuals served as managing partners at any Connecticut Outback Steakhouse. For reasons stated earlier, only the Newington restaurant will be at issue at trial, and the defendant has informed the court that the managing partner there was Manny Paolucci. No claimed statement by Scacca, Kadow or Lancaster constitutes an "admission" with regard to these violations.

During his testimony, Scacca was shown what was there described as a "Connecticut department of labor wage and workplace standards division tip statement."

As the defendant points out, this sample form, which the plaintiffs claim Outback Steakhouse should have been using, misstates the law. Scacca's testimony was that he had not seen the form before, which is not an admission of a violation. He then went on to testify that employees declared their tips in the computer when they clocked out daily and filled out a "checkout form" not otherwise there identified. The defendant asserts that this process of logging in constitutes a "signed statement" under the Connecticut Uniform Electronic Transactions Act, General Statutes § 1-266 et seq. Whether such entries constitute a "signature"[15] under the Connecticut Uniform Electronic Transactions Act[16] is a question of law to be decided by the court at trial since statutory interpretation is a court function. Nor is the testimony of either Kadow or Lancaster helpful to the plaintiffs on this point. The excerpted testimony from Kadow establishes only that the department of labor web site form (the so-called "tip credit statement") was not one he had seen before.[17] That portion of Lancaster's testimony to which the plaintiffs direct the court establishes only that a "check-out form" was used by employees to acknowledge tips received. Thus, the court has not been provided with any "admission" which may be offered as generalized proof.

As to the "wage record" the plaintiffs plan to offer as generalized proof of these claimed violations, no clarification of what is meant by "wage record" is provided. Without such guidance, the court concludes that

[15] General Statutes § 1-267 defines an " 'electronic signature' " as any "electronic sound, symbol or process attached to or logically associated with a record and executed or adopted by a person with the intent to sign the record."

[16] General Statutes § 1-272 further provides in relevant part that "[i]f a law requires a signature, an electronic signature satisfies the law."

[17] Further confusing matters is that this web site form, which was marked as exhibit seven at the Scacca deposition, is what is apparently identified in Kadow's deposition as "exhibit two during Mr. Scacca's testimony."

the term embraces the daily computerized record of each class member, since the plaintiffs' burden is to prove the defendant's violation of the act as to each named plaintiff and class member. It is unclear how many plaintiffs were employed in Newington, but it is likely that hundreds of records will need to be offered to cover the entire employment period of each class member. Such proof is "individualized" and, since the defendant has both a right and a desire to examine each class member, the result will likely be the conduct of as many minitrials as there are class members, a result which eliminates any advantage to the proposed class action.

Finally, the plaintiffs allege that the defendant exercised control over the plaintiffs' tips by maintaining a "policy and/or practice" of requiring the servers to share a portion of their tips with hostesses, bussers and bartenders. Thus, the plaintiffs assert, the servers did not customarily receive "gratuities," were not "service employees" as defined by § 31-62-E2 (e) of the Regulations of Connecticut State Agencies, and the defendant was not entitled to take the tip credit. The generalized proofs which will establish these facts—and thereby the conclusion that the defendant violated the regulation—are the "policies and testimony of managers." Specifically, the plaintiffs rely on a document captioned "Outback Steakhouse Tip Policy Version 1," dated January, 2004. The opening paragraph of that document declares that the practice of sharing tips "is required" and that tips "will be used as a credit against the minimum wage as permitted by federal and/or state laws." Paolucci, the Newington manager, testified at his deposition that 3 percent of the servers' gross sales[18] is taken out of the tips received and put into a tip pool for that purpose

---

[18] Other deposition testimony has referenced 3 percent of "net sales"; the Outback Steakhouse tip policy version one document is silent on that point.

and that, although the practice was a "requirement" and he had not known any instance where a server had "opted out" of the tip share pool, he believed they could. Paolucci testified that the Newington servers were not required to sign the aforementioned document. He stated that if a server advised him that he or she did not wish to share tips, he would seek direction from a supervisor.

The initial difficulty for the court is the plaintiffs' failure to cite any statute or regulation which makes tip sharing a violation of Connecticut law. That practice is neither addressed by the act nor by any regulation.

The plaintiffs build their claim on a two step construct: (1) § 31-62-E2 (e) of the Regulations of Connecticut State Agencies defines "gratuities" as a "voluntary monetary contribution received by the employee directly from a guest, patron or customer for service rendered"; and (2) a guide published by the department of labor for Connecticut restaurant employers reads into that definition of gratuities a requirement that "the employer cannot exert any control over it." Department of Labor, automation support unit, "Gratuities in the Restaurant Industry," at http://www.ctdol.state.ct.us/wgwkstnd/wage-hour/restaurant.htm.

The guide goes on to state: "This means that if a restaurant employer chooses to require customers to pay an added 'service charge' directly to the restaurant (not the employee), it is not a tip, even if the employer chooses to pass it along intact to the employee. Under this scenario, the employer could not take any tip credit." Id. Of interest is that the authors of this guide, which, as already discussed, does not have the effect of law, chose to expand on the regulation's definition of "gratuities" and then to apply that definition to a practice other than tip pooling. The plaintiffs' construct leads to conclusions unwarranted by the language of either the regulation or the guide; specifically, that because Outback Steakhouse asserts control over the

servers' tips by requiring them to share those tips with employees who do not receive tips, the tips received by the servers are, therefore, not "gratuities" (despite their being paid directly by the customers and the servers' receiving such tips "intact" and "whole"), that the servers are not "service employees" (despite the definition of that term under § 31-62-E2 [c] of the Regulations of Connecticut State Agencies) and that Outback Steakhouse may not, therefore, take the tip credit. The logic is, at best, tenuous and returns the court to the "service" versus "nonservice" issue, an inquiry already determined to require predominantly individualized proof.[19]

## III

## CONCLUSION

The motion to certify the class is, therefore, denied for all of the foregoing reasons.

---

[19] While it is so that the plaintiffs must establish that the defendant violated the act as to each of the class members in one or more of the ways asserted in count four of their complaint, it is not so, as the defendant frequently misstates, that the plaintiffs must also show that the harm to each such member was causally related to the violation or violations. Unlike in *Collins* v. *Anthem Health Plans, Inc.,* supra, 275 Conn. 309, damages here are statutorily imposed once liability is proven. See General Statutes § 31-68.